United States District Court
Middle District of Florida
Jacksonville Division

**MAUDE BURROUGHS JACKSON,**

    *Plaintiff,*

v.                                                          No. 3:16-CV-10-J-39PDB

**OCWEN LOAN SERVICING, LLC,**

    *Defendant.*

# Order

Maude Burroughs Jackson has filed a complaint alleging Ocwen Loan Servicing, LLC ("Ocwen"), violated state and federal consumer-protection laws, breached a settlement agreement, and wrongfully initiated a foreclosure action against her. Doc. 1. Before the Court is Ocwen's motion to dismiss the complaint for failure to state a claim upon which relief may be granted. Doc. 15. Jackson opposes the motion. Doc. 27.

## I.     Allegations

In the complaint, Jackson alleges the following facts.

In February 2005, Jackson refinanced her home mortgage. Doc. 1 ¶ 12. In July 2009, after falling on hard times, she requested and received a mortgage modification through the loan servicer, Litton Loan Servicing, L.P. ("Litton"). Doc. 1 ¶ 13. Through June 2010, she made each payment under the modified terms. Doc. 1 ¶ 14.

Litton would not accept Jackson's July 2010 payment and notified her that the loan was in default and her home was in foreclosure. Doc. 1 ¶ 14. On July 28, 2010, Litton's law firm faxed a letter to her demanding $12,926.72 to reinstate the

mortgage. Doc. 1 ¶ 15. Even though no foreclosure action had been filed, the amount included $906 for filing fees, $40 for "Mandatory Clerk Costs," $390 for title-search and examination fees, $220 for service-of-process fees, and $650 for attorney's fees. Doc. 1 ¶ 16.

Jackson disputed the amounts demanded and immediately sent the law firm a letter asserting that "the demand was 'grossly incorrect and completely without basis,' and that the demand did not identify any property or delinquent account, and that [she] was current on all payments." Doc. 1 ¶ 17. She also spoke to law firm representatives on the telephone, explaining the loan had been modified and she had made all of her payments before the July 2010 notification, but they refused to acknowledge the information and withdraw the foreclosure threat. Doc. 1 ¶ 18.

Fearing foreclosure and loss of her family's home, Jackson contacted the law firm and asked if she could make partial payments of the reinstatement amount. Doc. 1 ¶ 19. The law firm refused that and other requests and demanded she pay the entire reinstatement amount. Doc. 1 ¶ 19. Over the next three months, through December 2010, the law firm sent additional letters demanding more and more money each time. Doc. 1 ¶ 20.

In December 2010, hoping to save her home and unable and unwilling to "pay the amounts unlawfully demanded," Jackson, without a lawyer, sued Litton and the law firm in state court for "breach of contract, fraud, false credit reporting, and abusive collection practices." Doc. 1 ¶ 21.

The following year, in November 2011, Ocwen acquired Litton and obtained servicing rights for Jackson's loan. Doc. 1 ¶ 22. At that time, "the loan was alleged to be in default." Doc. 1 ¶ 23. In November and December 2011, she sent Ocwen two monthly payments of $1383.33. Doc. 1 ¶ 25. Ocwen told her the payments would be held in suspense and applied to the loan balance upon finalizing an agreement to settle the state action. Doc. 1 ¶ 25.

In June and July 2012, to settle the state action, Jackson and Ocwen executed a "Settlement and Release Agreement" and "Modification Agreement." Doc. 1 ¶ 24; *see* Doc. 1-1 (settlement agreement). The parties agreed to a new principal balance of $184,013, a new fixed interest rate of 3.89 percent for the rest of the loan period, and new monthly payments of $1257.43, consisting of $1016.85 to pay the principal and interest and $240.58 to pay property taxes and insurance. Doc. 1 ¶ 24; *see* Doc. 1-1.

After settlement, Ocwen used the suspended November and December 2011 payments to pay not the loan balance but what it had labeled "outstanding fees/expenses," totaling $2291.50, which included attorney's fees and costs incurred to defend the state action, filing and service fees for the foreclosure action never filed, and numerous "Property Inspection" and "Property Valuation" fees even though, under the settlement agreement, the fees and expenses had been released and prohibited from being assessed against the loan account and the suspended November and December 2011 payments. Doc. 1 ¶ 27; Doc. 1-2.

For tax year 2012, even though the settlement terms just reestablished the original modification terms, Ocwen filed with the Internal Revenue Service a Substitute Form 1099-C, titled "Cancellation of Debt," in which it represented it had discharged $29,383.63 of debt (including $24,064.20 in interest) associated with the loan, which resulted in tax liability for Jackson. Doc. 1 ¶¶ 28–29.

From June 2012 to February 2013, Jackson made timely monthly payments under the settlement agreement terms. Doc. 1 ¶ 30. But her bank erroneously dishonored the February 2013 payment. Doc. 1 ¶ 31. She "immediately brought the account current in the following months" and made timely monthly payments thereafter, but Ocwen charged multiple returned-check fees for the same returned check and late charges "in each subsequent month." Doc. 1 ¶ 31.

On August 22, 2013, while payments were current, Jackson mailed Ocwen a letter requesting that it (1) "remove the escrow impound account" based on her intent

3

to directly pay property taxes and insurance and (2) stop calling her about the loan. Doc. 1 ¶¶ 32–33; Doc. 1-3. On August 27, 2013, she sent a letter requesting a review of her account and corrections of improperly assessed late fees, property taxes, and insurance, and a failure to credit the August 2013 payment. Doc. 1 ¶ 34; Doc. 1-4.

Jackson timely sent cashier's checks for October, November, and December 2013 principal and interest payments. Doc. 1 ¶¶ 35, 37. She excluded amounts for property taxes and insurance in light of her request to pay them directly. Doc. 1 ¶¶ 35, 37.

On December 13, 2013, Jackson mailed Ocwen a letter reasserting she intended to directly pay property taxes and insurance and requesting "a thorough review of the account," an accounting of all payments she had made and the method of payment, and a termination of her escrow impound account. Doc. 1 ¶ 36; Doc. 1-5.

Ocwen did not apply Jackson's payments for October through December 2013 to her balance and instead made collection calls to her. Doc. 1 ¶ 37. During the calls, its representatives acknowledged the payments but told her they had been rejected. Doc. 1 ¶ 37. Ocwen did not return them to her and sent no notice to her indicating it had rejected them. Doc. 1 ¶ 37. The representatives said it did not have to apply the payments or return them to her. Doc. 1 ¶ 37.

On December 18, 2013, Ocwen sent Jackson a letter informing her the loan was in default based on her failure to make payments from October 2013. Doc. 1 ¶ 38; Doc. 1-6. Despite possessing the three cashier's checks for October, November, and December 2013 for the principal and interest payments, which totaled $3153, Ocwen demanded $5912.50 to reinstate the loan. Doc. 1 ¶ 38.

On January 3, 2014, Jackson filed a complaint with Florida's Office of the Attorney General concerning Ocwen's "faulty accounting of her payments and the runaround it gave her concerning reinstatement," its payment of legal expenses in

violation of the parties' settlement agreement, its refusal to terminate her escrow account despite her direct payment of property taxes and insurance, and its "false reporting of canceled debt" to the IRS. Doc. 1 ¶ 40; Doc. 1-7.

Because an account statement showed $1314 credited on October 2, 2013, Jackson mailed Ocwen a cashier's check for $1445.50, which, with the $1314 credit and her three previous cashier's checks for October, November, and December 2013 principal and interest payments totaling $3153, equaled the $5912.50 reinstatement demand. Doc. 1 ¶ 41; Doc. 1-8. Ocwen received the check on January 8, 2014, at 9:06 a.m. Doc. 1 ¶ 41. On the same day, Ocwen sent her a letter enclosing the three earlier cashier's checks, stating they were "insufficient to cure default." Doc. 1 ¶ 42.

On January 11, 2014, Jackson called Ocwen and spoke to Robin Abraham. Doc. 1 ¶ 43. Abraham told her the $1314 credit represented her September 2013 payment, and Ocwen was holding $1192.26 in suspense. Doc. 1 ¶ 43. Abraham explained Ocwen had increased her monthly payment by $122.02 in August 2013, so it had not accepted her August and September 2013 payments as full installment payments. Doc. 1 ¶ 43. Abraham confirmed Ocwen had sent no written notice of the increase. Doc. 1 ¶ 43.

On January 13, 2014, Jackson faxed a letter to Ocwen outlining what had happened and stating that, to cure the alleged default, she would send by overnight mail cashier's checks for $3153 and $131.74. Doc. 1 ¶ 44; Doc. 1-9. She explained those amounts, with the $1192.26 held in suspense, would equal the amount it demanded for reinstatement. Doc. 1 ¶ 44. She instructed Ocwen to reinstate the loan. Doc. 1 ¶ 44; Doc. 1-9. Ocwen refused to apply those payments and instead demanded $6791.52 to reinstate the loan. Doc. 1 ¶ 45.

On January 31, 2014, Jackson paid that "disputed" amount ($6791.52). Doc. 1 ¶ 46. She timely made all installment payments from then until November 2014, when she had to postpone her payment due to a family emergency. Doc. 1 ¶ 47. At the time and on several other occasions, she told Ocwen no payment would have been

necessary that month had it properly credited her account. Doc. 1 ¶ 47.

On December 17, 2014, Jackson paid Ocwen $1330, an amount exceeding the $1280 due for December 2014. Doc. 1 ¶ 48. On December 30, 2014, she paid Ocwen $1324.72, an amount exceeding the $1280 due for January 2015. Doc. 1 ¶ 49. On March 2, 2015, she paid Ocwen $1280 for February 2015. Doc. 1 ¶ 50. On March 24, 2015, Ocwen sent a notice of default to her. Doc. 1 ¶ 51. On March 30, 2015, she paid Ocwen $1280 for April 2015. Doc. 1 ¶ 52.

In early April 2015, Jackson applied for a loan modification through the Home Affordable Mortgage Program ("HAMP"). Doc. 1 ¶ 54. By letter dated April 3, 2015, Ocwen told her she was ineligible for the program because her payments were current. Doc. 1 ¶ 55; Doc. 1-10.

On April 18, 2015, Jackson answered a collection call from Ocwen and spoke to a representative named "Rustan," who told her that her home was in foreclosure. Doc. 1 ¶ 56. She told him an attorney represented her in planned litigation against Ocwen and gave him the attorney's name and contact information. Doc. 1 ¶ 56. He responded, "You cannot have an attorney—Ocwen must approve any decision whether or not to allow you to have an attorney." Doc. 1 ¶ 56. Distraught, she called her adult son to the telephone to speak to Rustan. Doc. 1 ¶ 57. After completing the security authorization to allow her son to talk to Rustan about her account, Rustan told him, "Your mom cannot have an attorney. [Ocwen] must approve any decision whether or not to allow you to have an attorney." Doc. 1 ¶ 57. Frustrated and outraged, her son hung up. Doc. 1 ¶ 57.

On June 3, 2015, Jackson paid Ocwen $1280 for May 2015. Doc. 1 ¶ 58. Despite that and the other timely monthly payments, Ocwen continued to "improperly allocate" her payments and "assess false, misleading, and unearned fees and charges" to the loan, including fees that were expressly released, waived, or prohibited under the settlement agreement. Doc. 1 ¶ 53.

On June 17, 2015, Ocwen returned Jackson's payment for May 2015, stating it was "insufficient to cure default." Doc. 1 ¶ 60. On June 26, 2015, it sent her a letter titled, "Reinstatement Quote," stating that she was delinquent on her loan payments and had to pay $6285.88 to reinstate the loan. Doc. 1 ¶ 59; Doc. 1-11.

On August 31, 2015, Ocwen filed a foreclosure action in state court against Jackson. Doc. 1 ¶ 61. On September 29, 2015, it served her with process. Doc. 1 ¶ 62. That foreclosure action remains pending.[1]

Ocwen's actions have caused and continue to cause Jackson "emotional distress, anxiety, fear, worry, embarrassment, and mental suffering, pain, anguish, and loss of capacity for the enjoyment of life." Doc. 1 ¶¶ 63–64.

## II. Claims

On January 6, 2016, Jackson filed the complaint in this action. Doc. 1. She asserts five claims. For each, Jackson "realleges and incorporates by reference" all of the factual allegations. *See* Doc. 1 ¶¶ 66, 77, 85, 92, 97.

In count I, Jackson asserts Ocwen violated §§ 1692c(a)(2), 1692c(c), 1692d, 1692e(2)(A), 1692e(8), 1692e(10), and 1692f of the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. §§ 1692–1692p. Doc. 1 ¶¶ 66–76. In count II, she asserts it

---

[1]At any stage and on its own, a court may judicially notice a fact that cannot be reasonably disputed because it is generally known or can be readily and accurately determined from sources whose accuracy cannot reasonably be questioned. Fed. R. Evid. 201. If a court takes judicial notice of a fact before notifying a party, the party still may be heard upon request. Fed. R. Evid. 201(e). "Courts may take judicial notice of publicly filed documents, such as those in state court litigation." *U.S. ex rel. Osheroff v. Humana, Inc.*, 776 F.3d 805, 811 n.4 (11th Cir. 2015).

Here, the Court may judicially notice facts about Ocwen's state foreclosure action against Jackson because they can be readily and accurately determined from sources whose accuracy cannot be reasonably questioned (state court documents).

violated §§ 559.72(5), (7), (9), and (18) of the Florida Consumer Collection Practices Act ("FCCPA"), Fla. Stat. §§ 559.55–559.77. Doc. 1 ¶¶ 77–84. In count III, she asserts it violated § 2605(k)(1)(C) of the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. §§ 2601–2617, and its implementing regulations, 12 C.F.R. §§ 1024.35–1024.36. Doc. 1 ¶¶ 85–91. In count IV, she asserts it breached the 2012 settlement agreement. Doc. 1 ¶¶ 92–96. And in count V, she asserts it wrongfully initiated foreclosure proceedings against her. Doc. 1 ¶¶ 97–101. She seeks damages, costs, attorney's fees, interest, and equitable relief. Doc. 1 at 17–21.

### III. Motion to Dismiss & Response

Ocwen moves to dismiss the complaint and particular claims on several grounds. As a threshold matter, it argues the complaint is an impermissible shotgun pleading because each count incorporates paragraphs 1 through 65 without indicating which allegations support which claim.[2] Doc. 15 at 2–4. Jackson responds

---

[2] Ocwen argues four counts fail to state claims on which relief may be granted. On the FDCPA claim, it argues Jackson fails to sufficiently allege it is a "debt collector" because she does not allege her loan was actually in default or it treated the loan as in default when it acquired servicing rights. Doc. 15 at 5–8. On the FCCPA claim, it argues she fails to sufficiently allege it acted with intent or knowledge, as required under FCCPA §§ 559.72(5), (7), (9), and (18), and any allegations supporting the FCCPA claim must concern events within the two-year statute of limitations. Doc. 15 at 8–10. On the RESPA claim, it argues she alleges no actual damages arising from conduct after RESPA's January 10, 2014, effective date. Doc. 15 at 10–11. On the wrongful-foreclosure claim, it argues she alleges no foreclosure sale occurred; Florida law recognizes no cause of action for attempted wrongful foreclosure; and, even if such a cause of action exists, it would have been a compulsory counterclaim in the foreclosure action. Doc. 15 at 12–15. It does not challenge the merits of the breach-of-contract claim but argues the Court should decline to exercise supplemental jurisdiction over all state-law claims if the Court dismisses the FDCPA and RESPA claims. Doc. 15 at 11 n.7.

Jackson argues the complaint sufficiently alleges Ocwen treated the loan as in default when it acquired servicing rights based on its predecessor's treatment of the loan, the absence of any indication it viewed the loan differently, its settlement of her state lawsuit, and its self-identification as a "debt collector" in letters to her. Doc. 27

the complaint appropriately groups factual allegations common to all counts in a single, chronologically organized section and does not fall within any category of "shotgun pleadings" the Eleventh Circuit has identified. Doc. 27 at 3–4.

IV.    **Law & Analysis**

Federal Rule of Civil Procedure 1 provides that the rules "should be construed, administered, and employed by the court and the parties to secure the just, speedy, and inexpensive determination of every action and proceeding." Rule 8(a)(2) provides that a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Rule 10(b) provides that a party must state claims in numbered paragraphs, "each limited as far as practicable to a single set of circumstances." Rule 12(b)(6) provides that a party may move to dismiss a claim for failure to state a claim upon which relief can be granted. And Rule 12(e) provides that a party "may move for a more definite statement of a pleading to which a responsive pleading is allowed but which is so vague or ambiguous that the party cannot reasonably prepare a response."

Complaints that do not comply with Rule 8(a)(2), Rule 10(b), or both "are often disparagingly referred to as 'shotgun pleadings.'" *Weiland v. Palm Beach Cty. Sheriff's Office*, 792 F.3d 1313, 1320 (11th Cir. 2015). The Eleventh Circuit has "identified four rough types or categories of shotgun pleadings" while recognizing that "the groupings cannot be too finely drawn." *Id.* at 1321. "The most common type—by

---

at 5–7. She argues the complaint sufficiently alleges Ocwen had the knowledge or intent required to establish violations of FCCPA §§ 559.72(5), (7), (9), and (18), and the Court may consider allegations outside the FCCPA's two-year statute of limitations based on the "continuing violation" doctrine. Doc. 27 at 8–17. She argues the complaint sufficiently alleges continuing emotional-distress damages arising from alleged RESPA violations, and she need not establish the precise dates of those alleged violations at this stage. Doc. 27 at 18–19. She argues the complaint alleges a viable wrongful-foreclosure claim, and she was not required to bring it in the state foreclosure case. Doc. 27 at 19–20.

a long shot—is a complaint containing multiple counts where each count adopts the allegations of all preceding counts, causing each successive count to carry all that came before and the last count to be a combination of the entire complaint." *Id.* The second type is "replete with conclusory, vague, and immaterial facts not obviously connected to any particular cause of action." *Id.* at 1322. The third type fails to "separat[e] into a different count each cause of action or claim for relief." *Id.* at 1323. And the fourth type "assert[s] multiple claims against multiple defendants without specifying which of the defendants are responsible for which acts or omissions, or which of the defendants the claim is brought against." *Id.* "The unifying characteristic of all types of shotgun pleadings is that they fail to one degree or another, and in one way or another, to give the defendants adequate notice of the claims against them and the grounds upon which each claim rests." *Id.*

Shotgun pleadings "unnecessarily tax the time and resources" of trial and appellate courts. *Keith v. DeKalb Cty., Ga.*, 749 F.3d 1034, 1045 n.39 (11th Cir. 2014). The Eleventh thus has "roundly, repeatedly, and consistently" condemned them. *Paylor v. Hartford Fire Ins. Co.*, 748 F.3d 1117, 1126 (11th Cir. 2014).

"A defendant served with a shotgun complaint should move the district court to dismiss the complaint pursuant to Rule 12(b)(6) or for a more definite statement pursuant to Rule 12(e) on the ground that the complaint provides it with insufficient notice to enable it to file an answer." *Id.* at 1126−27 (internal footnotes omitted). In the absence of either, "nothing should stop District Courts from demanding, on their own initiative, that the parties replead the case." *Id.* at 1127.

Dismissal under Rule 12(b)(6) is warranted if the allegations fail to state a claim upon which relief can be granted; dismissal under Rule 8(a)(2) or Rule 10(b) is warranted if "it is *virtually impossible* to know which allegations of fact are intended to support which claim(s) for relief." *Weiland*, 792 F.3d at 1325 (emphasis in original; internal quotation marks omitted).

Here, by incorporating all factual allegations into all counts, and with some counts containing alleged violations of multiple and varied statutory provisions, the complaint does not perfectly fit the rough categories of shotgun pleadings the Eleventh Circuit has identified but shares their unifying characteristic: it fails to give Ocwen sufficient notice of each claim against it and the grounds upon which each claim rests. *See Weiland* 792 F.3d at 1323; *see also Johnson Enters. of Jacksonville, Inc. v. FPL Grp., Inc.*, 162 F.3d 1290, 1332–33 (11th Cir. 1998) (using the "shotgun" label for a "complaint that began with thirty-seven paragraphs of general allegations that were incorporated by reference into each count").

Because of the shotgun nature of the complaint, Ocwen seeks dismissal of the complaint under Rule 12(b)(6). That relief is unwarranted because the complaint does not entirely fail to state a claim upon which relief may be granted (for example, Ocwen does not seek dismissal of the breach-of-contract claim for any other reason). That relief is unwarranted under Rules 8(a)(2) and 10(b) because it is not virtually impossible to know which factual allegations are intended to support which claims for relief. But, as Ocwen contends, it is very difficult, particularly for the counts containing alleged violations of multiple and varied statutory provisions. To obtain a more just, speedy, and inexpensive resolution through a more tailored and carefully drawn complaint, striking the complaint and requiring repleader is warranted.

Some cases are good candidates for early resolution, and this case seems to be one of them. The Court directs the parties to confer on whether they would like the Court to stay the case and discharge the current case-management and scheduling order deadlines, Doc. 30, to allow sufficient time for settlement talks (before Peter Grilli or, if the parties request, a United States Magistrate Judge) before discovery and dispositive-motion expenses mount. They must file a notice concerning how they would like to proceed by **February 3, 2017**. Absent a stay, Jackson must file an amended complaint by **February 17, 2017**, and either party or both must file a motion to extend the case-management and scheduling order deadlines, Doc. 30, if

11

desired, including for reasons similar to those in the previous joint motion for extension, Doc. 29.

The motion to dismiss, Doc. 15, is **granted** to the extent Jackson must replead but otherwise **denied without prejudice** to reasserting any arguments in response to the amended complaint.

**Ordered** in Jacksonville, Florida, on January 19, 2017.

PATRICIA D. BARKSDALE
*United States Magistrate Judge*

c:  The Honorable Brian J. Davis
    Counsel of Record